IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
00 JUL 12 P:...
U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
JUL 1 2 2000

| | |
|---|---|
| JERRY MITCHELL; CATHY MITCHELL, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 99-G-0164-S |
| | ) |
| TOMMY MITCHELL, individually and d/b/a Mitchell Motors, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The defendant in this action filed a motion for summary judgement, asserting that a general release executed in connection with litigation in the California state courts bars recovery by plaintiff Jerry Mitchell in the instant action.[1]  Upon reviewing the materials submitted by the parties, it appeared to the court that the plaintiffs would be unable to prevail on their negligence claim based upon the proffered expert testimony.  Accordingly, the court entered an order noting that it was of the opinion that the defendant appeared to be entitled to summary judgment "as to all claims asserted by both plaintiffs in their complaint."  That order set up a briefing schedule to consider

---

[1]  The defendant acknowledges that plaintiff Cathy Mitchell was not a party to the California action and did not execute the release.



summary judgment as to all claims by both plaintiffs and also asked the parties to address

the issue of the admissibility of the plaintiffs' putative expert witness's deposition in light

of recent Supreme Court decisions.  The matter is now ripe for decision.

## FACTUAL BACKGROUND

The basic facts out of which this action arose are not in serious dispute.[2]

On February 12, 1997, plaintiff Jerry Mitchell  sold a 1990 Chevrolet Suburban to the

defendant, Tommy Mitchell, who operates a car lot in Birmingham Alabama.  On the day

of the sale, it was determined that the battery installed in the vehicle was faulty, and

Tommy Mitchell had an independent mechanic remove the existing battery and replace it

with a used battery which was already on hand.  Plaintiff Jerry Mitchell, who had

apparently planned to return to his home in California by air, changed his mind and

decided to rent the Suburban he had just sold defendant Tommy Mitchell.  The

transaction was completed on February 14, 1997, and plaintiff Jerry Mitchell rented his

former vehicle from the defendant.  Plaintiff Jerry Mitchell left for Sacramento,

California, on February 14, 1997, and estimates that the trip was approximately 1,600 to

1,700 miles and took 3 to 4 days.  He did not encounter any problems with the Suburban

during the trip, however, when plaintiff Jerry Mitchell and his wife were in Long Beach,

California, on February 24, 1997, the car quit running at a traffic signal.  Plaintiff Jerry

---

[2] The defendant, Tommy Mitchell is related to plaintiff Jerry Mitchell.  Cathy
Mitchell is the wife of plaintiff Jerry Mitchell.  Her claim is for loss of consortium.

Mitchell had a mechanic check the vehicle and was informed that the alternator was

faulty and needed to be replaced.  Rather than letting the mechanic replace the alternator,

he took the vehicle to Chief Auto Parts.  The Alternator was again tested at Chief Auto

Parts and determined to be defective.  Plaintiff Jerry Mitchell and an employee of Chief

Auto Parts removed the alternator and replaced it.  Approximately 5 hours and 300 miles

later, plaintiff Jerry Mitchell and his passengers stopped at a gasoline station.  The

Suburban refused to start, and plaintiff Jerry Mitchell's son raised the hood.  The son left

to borrow jumper cables and plaintiff Jerry Mitchell got out of the vehicle and walked to

the front.  Plaintiff Jerry Mitchell stated that he looked at the battery just as it exploded.

As a result of the explosion, plaintiff Jerry Mitchell eventually lost his left eye.

### THE CALIFORNIA LITIGATION

On July 16, 1997, Jerry Mitchell filed suit in California.  In that action,

Civil Action 97-AS-03435, named defendants included Chief Auto Parts, Arrow

Automotive Industries, Delco Corporation, Megatron Inc., and Tommy Mitchell d/b/a

Mitchell Motors.  Tommy Mitchell filed a motion to quash service on the ground that

there was no personal jurisdiction. The motion was granted October 24, 1997.  Chief

Auto Parts subsequently settled with Jerry Mitchell on October 21, 1998, for the sum of

$175,000 and a release was executed.  The release, signed by Jerry Mitchell, provides in

pertinent part as follows:

> [T]he undersigned, hereby releases and forever discharges CHIEF AUTO
> PARTS and all other persons, firms corporations and tortfeasors in

3

accordance with Section 877 of the Code of Civil Procedure of the State of California of and from any and all claims, demands, actions, or causes of action known or unknown, including all injuries, deaths, property damage and all other liabilities arising out of or in any way connected with or resulting from the accident, occurrence, casualty or event, which occurred on or about February 25, 1997 at/on Westley, California, Stanislaus County and is the subject of Sacramento Superior Court No 97-AS-03435, entitled JERRY MITCHELL VS. CHIEF AUTO PARTS.

* * * *

This is a full and final release applying to all unknown and unanticipated injuries, deaths, liabilities or damages arising out of said accident as well as to those now known or disclosed, and the undersigned waives all rights or benefits which the undersigned now has or in the future may have under the terms of Section 1542 of the Civil Code of the State of California, which reads:

> A general release does not extend to the claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with debtor.

Following the execution of this release, Jerry Mitchell proceeded to trial against Johnson Controls Inc. During the trial, Jerry Mitchell settled with that defendant.

## DISCUSSION

### I.

Defendant Tommy Mitchell argued in his original motion for summary judgment that the above release operated to release him from the claims asserted in the instant action by plaintiff Jerry Mitchell. Because the defendant concedes that plaintiff Cathy Mitchell would not in any event be bound by the release executed in the California

4

litigation, the court will first address whether summary judgment is proper as to all of plaintiffs' claims because of their failure to introduce a genuine issue for trial.[3]

   The plaintiffs claim that defendant "negligently acquired, repaired, entrusted, owned, sold, purchased, or otherwise installed an automobile battery" so as to cause the plaintiffs' injuries." Plaintiff Jerry Mitchell was injured when the battery in his Chevrolet Suburban exploded. In order to prevail, the plaintiffs must prove that the defendant's negligence proximately caused the explosion. The only testimony in the record concerning the cause of the battery explosion comes from plaintiffs' putative expert, Edward N. Mrotek.[4] Mr Mrotek, when asked his opinion as to the cause of the explosion, replied as follows:

> In a brief form . . . a lot of force was applied to the side terminal, causing the stainless steel cap to be deformed by the force that's being applied, causing the side terminal weld — and that's the union between the front cap and the internal parts of the battery — to separate or to push out, causing a break in continuity between the front cap and the back cap.

---

[3] The court in its order of October 22, 1999, specifically notified plaintiffs that the defendant appeared to be entitled to summary judgment as to all claims asserted by both plaintiffs. That order also specifically recited that it was being entered to conform with the rule for the entry of summary judgment sua sponte as set forth in Massey v. Congress Life Ins. Co., 116 F. 3d 1414 (11th Cir. 1997). The court alerted the plaintiffs that it was considering the entry of summary judgment as to all of their claims and provided them with ample time to come forward with evidence demonstrating the existence of a genuine issue of material fact.

[4] Mr. Mrotek is a principal engineer for Johnson Controls Battery Group, Inc., a defendant in the California litigation and the company that manufactured the subject battery.

(Mrotek depo. at 26.)  The plaintiffs allege that the defendant was negligent when he applied excessive torque to the battery terminal bolt.  Without expert testimony demonstrating that the alleged application of excessive torque to the side terminal caused the battery explosion, plaintiffs cannot prevail.[5]  Clearly the causes of battery explosions are beyond the understanding of laymen without the aid of expert testimony.  Plaintiffs have acknowledged in brief that "the fracturing of the negative terminal by over-torque ing [sic] of the battery cable is surely not something within the common knowledge of jurors."  (Plaintiffs' Memorandum of Points and Authorities in Opposition to Motion for Summary Judgment at p. 3.)  A jury finding that the application of excessive torque to the side terminal of the battery caused the explosion would be mere speculation without the aid of expert testimony.

## II.

The court noted in its order of October 22, 1999, the plaintiffs had not complied with the deadline regarding expert witnesses.  The plaintiffs still have not filed the required summary with the court.  The scheduling order warns in bold face italics that "*[f]ailure on the part of any party to file proper summaries with the court will be grounds for forfeiture of that party's right to use expert testimony at trial.*"  (Doc. # 8

---

[5] Of course the plaintiffs must also prove that the defendant overtightened the terminal and that that act was the proximate cause of their injuries.  Merely proving that the side terminal was overtightened by someone is insufficient to support a verdict against the defendant.

at p. 2)  The deposition excerpts  and other materials submitted by the plaintiff do not

comply with the requirements of the scheduling order, which requires "a complete report

under Fed. R. Civ. P. 26(a)(2)(B) of the opinions of each party's expert witnesses" that

must "include all conclusions and all reasoning supporting conclusions, including the

scientific or professional theories or standards relied upon."  (Doc. # 8 at p. 2)  The

plaintiffs have not demonstrated good cause for their failure to submit the expert summary

required by the court's scheduling order.

### III.

      Even if plaintiffs' putative expert testimony is not barred because of

plaintiffs' failure to comply with the court's scheduling order, the court must exercise its

gatekeeper function to determine whether the testimony is reliable and relevant.  This

gatekeeper function was recently addressed in <u>Kumho Tire Co. Ltd. v. Carmichael</u>, 526

U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999).  The Court considered whether the

general principles set forth in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S.

579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), apply to the testimony of "engineers and

other experts who are not scientists," 526 U.S. at 141, 119 S. Ct. at 1171.  The Court

concluded that <u>Daubert</u> applies to all expert testimony.  526 U.S. at 149, 119 S. Ct. at

1175.  The Court also made clear that the factors recited in <u>Daubert</u> are not exclusive and

that the inquiry must be tied to the facts of each particular case.  526 U.S. at 152, 119 S.

Ct. at 1176 ("[W]e conclude that the trial judge must have considerable leeway in

7

deciding in a particular case how to go about determining whether particular expert

testimony is reliable."). The Court in <u>Kumho</u> also emphasized that the trial court's

decision to admit or exclude expert testimony under <u>Daubert</u> is to be reviewed under an

abuse-of-discretion standard. <u>Id.</u> The same standard of review is applied to the court's

decisions about how to test an expert's reliability. <u>Id.</u>

   In <u>Kumho</u> the trial court excluded expert testimony about the cause of a tire

explosion. The similarity of the experts methodology in <u>Kumho</u> and Mr. Mrotek's

methodology in the present case caused this court to question whether it was admissible.

After reviewing the deposition excerpts of Mr. Mrotek's testimony concerning the cause

of the battery explosion, the court determines that it does not meet the standard for

admissibility under the Federal Rules of Evidence. The plaintiffs have not demonstrated

that the testimony of Mr. Mrotek is both reliable and relevant to the issue before the court.

The following deposition excerpts illustrate the reliability problems with Mr. Mrotek's

testimony.

   Q:  What sort of examination did you do?

   A:  It would be an examination where I would look at all the component
      parts that are present and than compare — seeing that I'm involved
      with designing batteries, I have an idea of what all the components
      should look like, then I take a mental comparison to that, and I look
      for something that deviates from what I would consider norm, and
      then I would investigate that further by more examination and
      document that with photographs.

   Q:  Did you do any testing of any sort?

A:     No, because there was no protocol for testing.

Q:     No protocol for testing. What do you mean by that?

A:     Well, all I can do is look at the battery as it sits there. I really can't take anything out or disassemble anything. I can touch things with my hand and see like, for example, a weld is there by just physically pulling on it, but I couldn't do anything else.

(Mrotek depo. at 9.)

Q:     Now, tell us — I got off track there for a while — when you examined this battery, tell me generally what you found.

A:     What I found. Well, one, that the cover was blown off, or a better way to put it, when I saw it, there was no cover. I don't know if anybody removed it or not, I'm just saying the cover wasn't there. It looks like the fractures there separated from the explosion.

(Mrotek depo. at 16.) In spite of the lack of any actual testing being performed by Mr.

Mrotek, he testified that the explosion was caused by excessive torque being applied to

the side terminal of the battery:

Q:     Now, you have formed an opinion as to what the cause of this explosion was. Would you tell us briefly what that was, please.

A:     In a brief form is that a lot of force was applied to the side terminal, causing the stainless steel cap to be deformed by the force that's being applied, causing the side terminal weld — and that's the union between the front cap and the internal parts of the battery — to separate or to push out, causing a break in continuity between the front cap and the back cap.

(Mrotek depo. at 26.) Despite this rather definite statement as to the cause of the

explosion, Mr. Mrotek just two pages later in his deposition testified as follows:

9

A:     Yeah.  What we have here is you'd have a runner between what you
       call the triangular piece, which I would probably call a riser, which
       would go to the lugs of the plates, and this riser here has a washer,
       and you can see the tab here, it's a power tab, and you can see some
       lead, and that's broken away from the main body of the side
       terminal, and that's represented by the hole that's there where the
       weld did not break but the material in the side terminal separated
       because of force being applied to it

Q:     And this would this be the tightening force of actually applying the
       — of screwing the clamp in?

A:     It could be that or some other application where someone maybe
       used a long bolt.  You could have a long bolt, and then someone
       comes in and puts a standard connector on there, overtightens it
       because they feel there's some looseness in it, and it's the combined
       effect either of a battery used before, either a long bolt, or damaged
       by abusive force or abusive force at the time of installation.

(Mrotek depo. at 27-28.)

       While Mr. Mrotek's opinion as to the cause of the battery's explosion is

stated quite clearly, the reasoning supporting those conclusions is not.  Had the plaintiffs

chosen to comply with this court's scheduling order, the court would have a report setting

forth the reasoning supporting Mr. Mrotek's opinions.  Because they did not do so, the

deposition excerpts of Mr. Mrotek's testimony are the only materials available to assess

his methods.

       Foremost among the problems with Mr. Mrotek's method is the

acknowledged lack of testing. A review of Mr. Mrotek's deposition testimony reveals that

his reasoning is grounded solely upon his visual and tactile examination of the battery.

("Well, all I can do is look at the battery as it sits there.  I really can't take anything out or

10

disassemble anything.  I can touch things with my hand and see like, for example, a weld is there by just physically pulling on it, but I couldn't do anything else.")  Rather than subjecting the battery to testing, Mr. Mrotek relied solely upon his visual and tactile examination of the battery after its explosion in forming his opinions.[6]  In the present case, these methods appear to be highly unreliable.

The imprecision of this method is shown by Mr. Mrotek's inability to determine whether the top of the battery was blown off or had been removed by someone after the explosion.  ("[T]he cover was blown off, or a better way to put it, when I saw it, there was no cover.  I don't know if anybody removed it or not, I'm just saying the cover wasn't there.  It looks like the fractures there separated from the explosion.")  It is clear to the court that if the methods used by Mr. Mrotek do not allow him to determine whether the top had been blown off by the explosion, these methods would likewise not allow him to determine with any degree of reliability that the side terminal had been damaged by the application of excessive torque prior to the explosion.  See, Kumho, 526 U.S. at 155, 119 S. Ct. at 1177 (noting it was reasonable for the trial court to question the reliability of a method of visual and tactile inspection that would not allow the expert to determine whether the tire in question had traveled more than 10, or 20, or 30 or, 40, or

_____

[6]  The court notes at this juncture that it does not question Mr. Mrotek's qualification to testify as an expert on the possible causes of battery explosions in general. In the present case, however, the relevant question is whether this particular explosion was in fact caused by the application of excessive torque.

11

50 thousand miles).  In short, a methodology that is so imprecise as to not allow Mr. Mrotek to determine whether the top of the battery was blown off or removed by someone after the explosion, cannot at the same time be sufficiently precise to allow Mr. Mrotek to determine that excessive torque to the side terminal bolt was the cause of the battery explosion.

In the deposition excerpts submitted to the court, the court is able to discern only one instance when Mr. Mrotek described what caused him to form the opinion that excessive torque had been applied to the side terminal:

> A:   Yeah.  What we have here is you'd have a runner between what you call the triangular piece, which I would probably call a riser, which would go to the lugs of the plates, and this riser here has a washer, and you can see the tab here, it's a power tab, and you can see some lead, and that's broken away from the main body of the side terminal, and that's represented by the hole that's there where the weld did not break but the material in the side terminal separated because of force being applied to it

(Mrotek depo. at 27.)[7]  This description is very imprecise on its face and is little more than a restatement of his conclusion that excessive torque caused damage to the side terminal.  There is no explanation of why lead broke away from the side terminal and the

---

[7] Mr. Mrotek's also described the multiple tang marks he found on the side terminal bolt, which supported his conclusion that the cable had been bolted to the terminal at least three separate times.  He nowhere explains any connection between the number of times the cable had been installed and the cause of the battery explosion.  If anything this evidence weakens the plaintiffs' case by raising the possibility that if excessive torque was applied to the bolt, it could have been by someone other than the defendant since the bolt was tightened at least three separate times.

presence of a hole supports his conclusion that excessive torque was applied to the side

terminal bolt.  Mr. Mrotek's response to the immediately following question casts even

greater doubt on the reliability of his methods:

> Q:    And this would this be the tightening force of actually applying the
> — of screwing the clamp in?

> A:    It could be that or some other application where someone maybe
> used a long bolt.  You could have a long bolt, and then someone
> comes in and puts a standard connector on there, overtightens it
> because they feel there's some looseness in it, and it's the combined
> effect either of a battery used before, either a long bolt, or damaged
> by abusive force or abusive force at the time of installation.

(Mrotek depo. at 27-28.)  This answer suggests that the failure of the side terminal noted

by Mr. Mrotek could have been caused by a combination of things — either the

application of excessive torque to a standard bolt, the application of excessive torque

because an excessively long bolt was used or "the combined effect either of a battery used

before, either a long bolt, or damaged by abusive force or abusive force at the time of

installation."  When this entire exchange is read, it is not even clear that Mr. Mrotek is

unequivocally testifying that the application of excessive torque caused the battery

explosion.  He appears to leave open the possibility that a combination of factors could

have caused the damage to the side terminal.

Based upon the above the court concludes that the plaintiffs' proffered

expert testimony is inadmissible under Daubert and Kumho.  Mr. Mrotek's conclusion

that the battery explosion was due to the application of excessive torque to the side

terminal is not sufficiently reliable so as to be admissible.  None of the factors set forth in

Daubert supports the admissibility of Mr. Mrotek's testimony.  Nothing in the record

explains how his techniques can be tested, how his method of analysis of the battery in

question has been subjected to peer review, what standards control his technique's

operation nor how his particular method of examining the subject battery has general

acceptance within the relevant scientific community.[8]  The court reiterates that its holding

is not based upon a finding that Mr. Mrotek is not qualified as an expert with respect to

the causes of battery explosions in general.  The question presented to this court,

however, is specific:  "Did the application of excessive torque to the side terminal bolt

cause this particular battery to explode?"  Mr. Mrotek's testimony would not aid the trier

of fact in resolving that question.

    Without expert testimony to establish that the application of excessive

torque caused the battery in this case to explode, the plaintiffs cannot prevail.  Even if

they were to prove that the defendant applied excessive torque, without some evidence

that act was the proximate cause of the explosion, their case must fail.

---

  [8]  Mr. Mrotek's declaration submitted in response to the court's suggestion that his
testimony was inadmissible only addresses "torque testing methodology for side terminal
batteries."  It does not explain how or if that methodology was used in his examination of
the subject battery.

14

## IV.

Merely proving that the application of excessive force caused the battery in this case to explode, on which point the plaintiffs have failed to introduce a genuine issue for trial, is not enough.  The plaintiffs must prove that the defendant was the one responsible for that action.  This is a necessary element of the plaintiffs' claim and if they have not introduced a genuine issue for trial on this issue summary judgment must be entered in favor of the defendant.  Plaintiffs' expert evidence on this issue is insufficient. Mr. Mrotek testified as follows:

Q:     All right.  Well, it would appear that there had been at least three and probably more installations.  Is there any way of telling when this damage might have taken place?

A:     I can't put a time frame, but in the testimony of  — Mr. Mitchell, who owns the lot, indicates in his testimony that the battery was like a yard battery, one that would be used for starting cars or be swung around, and that was put into the Suburban, and it was tightened down.  So it could have been damaged from the fact that it was used in prior installations on vehicles on the lot, or it could have been damaged at the time of the final installation into the suburban.

(Mrotek depo. at 28.)

Q:     Back to my question.  Is there any way at all to tell when this overtightening, as you called it might have occurred?

A:     I can't place or date myself from looking at the battery.  I can just go, again, by the deposition that Tommy indicated that when he — Mr. Mitchell, when he installed the battery, he severely over — he tightened it very hard — I'm not quoting him — but he tightened it very hard, and he used a very large pair of pliers.

(Mrotek depo. at 30.)

> Q:    So if I understand what you said correctly, there's no way to tell
>       when this separation might have been caused or by whom.  Am I
>       correct in that?
>
> A:    I think that's what I — my deposition indicated that I knew the
>       fracture took place, but I couldn't say who did it.  All I knew is it
>       was due to abuse.

(Mrotek depo. at 32.)  Mr. Mrotek is very clear.  He testified that based upon his

inspection of the battery he was unable to say when or by whom excessive torque was

applied to the side terminal.[9]  His only reason for concluding that the defendant applied

excessive torque to the side terminal was the defendant's deposition testimony.  Mr

Mrotek characterized that testimony as being "that he tightened it very hard — I'm not

quoting him — but he tightened it very hard, and he used a very large pair of pliers."

The plaintiffs submitted only six pages from the defendant's deposition.

The only reference to his tightening the side terminal of the battery is as follows:

> Q:    Okay, Were you present when Mr. Snyder installed the Interstate
>       battery in the Suburban?
>
> A:    No, I wasn't there at the particular time when he put the battery in.
>
> Q:    After the battery was installed by Mr. Snyder, did you personally
>       make any adjustments or do anything to the interstate [sic] battery?

---

[9]  Again, the court finds Mr. Mrotek's expert conclusions that excessive torque was
applied to the side terminal and that this was the cause of the battery explosion unreliable
and inadmissible.  This is the only theory of causation even remotely supported by Mr.
Mrotek's testimony, so the court will not consider other theories of causation-such as
prior abuse by the defendant.

16

A:   The next following day, I went to start the vehicle, and the battery wasn't doing what it was supposed to.  It was going like a skip, you know, it was weak, (indicating).  So I went and checked the battery, cables wasn't — to me wasn't tight enough, so I got a pair of pliers and turned the cables.

* * * *

Q:   . . . Were these pliers specially made for use with battery installation?

A:   No, just regular pair of pliers.

Q:   Well, when you say regular, can you describe the shape or their approximate size?

A:   Well, probably, what, about a foot long pair of pliers with teats on them, just a regular pair of pliers.

(Tommy Mitchell depo. at 17-19.)  The defendant in his deposition testimony submitted to the court does not say anything about how hard he tightened the bolt.  He merely states that he "turned the cables."   Mr. Mrotek's conclusion that the defendant "tightened it very hard" is not supported by any deposition testimony submitted to the court and as an expert opinion is inadmissible.

Mr. Mrotek testified that pliers are not a proper tool to use when tightening a side terminal battery:

A:   No, not in this case.  In fact, Delco went to great pains to make a small head on the terminal so people would have to use a small socket wrench and then also probably like a quarter inch driver, so you can only generate so much torque pressure.  When you take a pair of pliers and grip on it and it has 12 inch length, you can generally rate a lot of inch pounds or foot pounds of pressure.  And I

17

> don't know, if a person is relatively strong, you can — the person's
> physical strength enters into it.

(Mrotek depo. at 30.)  Mr. Mrotek offers no support for his conclusion that pliers are an

improper tool to tighten a side terminal battery bolt.  At best his testimony might create a

question of fact as to whether excessive force could be applied with pliers like those used

by the defendant.  It is not sufficient to merely show that the defendant could have

overtightened the bolt using pliers — plaintiffs must prove that the defendant actually

overtightened the bolt.  The deposition testimony of the defendant does not create an issue

of fact as to his actually having overtightened the side terminal bolt.

## V.

Issues concerning the type of evidence necessary to support a jury verdict

and the burden of persuasion are matters of state substantive law.[10]  In addition, it is a

---

[10] "A federal court sitting in diversity applies the substantive law of the state in
which it sits, including that states choice of law.  Alabama's law of conflicts applies the
lex loci contractus and lex loci delicti." Picker International, Inc. v. Parten, 935 F.2d 257,
260 (11th Cir. 1991)(citations omitted).  In this case, because the injury occurred in
California, Alabama courts would apply the law of California.  Norris v. Taylor, 460 So.
2d 151, 153 (Ala. 1984)(if injury occurs in jurisdiction other than where wrongful act or
omission takes place, law of jurisdiction where injury was sustained controls).  California
law (both decisional and statutory) is presumed to be the same as Alabama's.  State v.
Sparks, 215 So. 2d 469 (Ala. Ct. App. 1968).  It is no longer the rule in Alabama that
foreign law must be pleaded and proved.  See Ala. Rules of Civ. P. 44.1 (court may
consider any relevant material or source in determining foreign law).  However, the rule
is permissive only, and does not impose upon the court the affirmative duty to conduct
independent research as to foreign law.  See Goodman v. Director of Department of
Public Safety, 332 So. 2d 396 (Ala. Civ. App. 1976)(citing Wright and Miller, Federal
Practice and Procedure § 2444, the current version of which notes that nothing in the
(continued...)

18

matter of Alabama substantive law that causation testimony must have "selective application."

In <u>Allison v. McGhan Medical Corp.</u>, 184 F.3d 1300 (11th Cir. 1999), the court addressed the interplay between state substantive law and expert testimony in a federal diversity action. As that court noted: "Proffered expert testimony must meet the legal as well as the substantive issues of the case." 184 F.3d at 1320. The court observed that under Georgia law "medical testimony as to the possibility of a causal relation between a given [negligent act] and the subsequent [injuries alleged to have been caused by the negligence] is not sufficient, standing alone, to establish such relation." 184 F.3d at 1320 (alterations in original). The court also noted that under Georgia law "medical expert testimony was essential to prove causation in this case." 184 F.3d at 1320. Having set forth these substantive state law requirements the court concluded that the proffered testimony from the sole causation expert was insufficient to establish causation under Georgia law. The court, therefore, held the evidence would not be helpful under Rule 702 of the Federal Rules of Evidence. 184 F.3d at 1320. The law of Alabama as to the type of proof necessary to establish causation is similar to the law of Georgia applied in <u>Allison.</u>

---

[10](...continued)
corresponding federal rule requires a court to engage in independent research as to foreign law). Since neither party has cited California law on the issue of causation, the court will presume that on that issue it is the same as Alabama's.

It has long been the law in Alabama that evidence of causation must have selective application.

> Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause.
>
> But a nice discrimination must be exercised in the application of this principle. As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

Southern Ry. Co. v. Dickson, 100 So. 665, 669 (Ala. 1924)(internal quotation marks omitted). The application of this rule to the present case can be seen in a very recent Alabama case.

In Ex Parte Diversey, 742 So. 2d 1250 (Ala. 1999), the plaintiff alleged that her health problems were caused by chemicals she had been exposed to in her job at a commercial laundry. Diversey manufactured all but one of the chemicals the plaintiff was exposed to. Plaintiff's expert testified that "it was more probable than not that 'any or all' of the chemicals to which [plaintiff] was exposed caused her injuries." 742 So. 2d at 1254. The court applied the rule set out in Dickson and concluded that because plaintiff's expert's theory of causation "is just as consistent with the theory that sodium hypochlorite

[the chemical not manufactured by Diversey] caused [plaintiff's] injuries as it is with the theory that one or more of Diversey's products caused her injuries," it was without selective application. 742 So. 2d at 1255. Therefore, the court found the expert's testimony to be "mere 'conjecture,' which is insufficient to support a finding of fact." Id.

In the present case, the testimony of plaintiff's expert does not have selective application to the theory that excessive torque applied by the defendant caused the battery explosion. As has been noted, Mr. Mrotek testified that it could have been the application of excessive torque "or some other application where someone maybe used a long bolt . . . and it's the combined effect either of a battery used before, either a long bolt, or damaged by abusive force or abusive force at the time of installation." This testimony is directly analogous to that in Diversey and is consistent with theories of causation other than the application of excessive force. On that point under the law of Alabama it is mere "conjecture" and is insufficient to support a finding that excess torque was the cause of the battery explosion.

Likewise, Mr. Mrotek's testimony about the defendant's use of long pliers as the cause of the alleged damage to the battery does not have selective application. At best Mr. Mrotek's testimony establishes that excessive torque could be generated by the use of long pliers. There is nothing in Mr. Mrotek's testimony, however, that would indicate that the defendant actually used excessive force. His testimony is, therefore, just as consistent with the theory that the defendant did not generate excessive torque even

21

though he used long-handled pliers.[11]  Additionally, Mr. Mrotek testified that he had no way to determine when or by whom the alleged excessive torque was applied.

The requirement of "selective application" is also a part of the <u>Daubert</u> inquiry.  Similar to the instant case, the plaintiffs in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 43 F.3d 1311, 1322 (9th Cir. 1995)("<u>Daubert II</u>"),[12] had introduced expert evidence from which  "the strongest inference to be drawn . . . is that Bendectin[13] could <u>possibly</u>, have caused plaintiffs' injuries."  43 F.3d at 1322.  Just as in <u>Daubert II</u>, the expert evidence in the present case fails to support a finding that any alleged breach by the defendant of its standard of care actually caused the battery explosion.  It is clear that as to the issue of causation, the proffered expert testimony fails to satisfy the second prong of Rule 702 and should be excluded.  <u>See</u> <u>Daubert II</u>, 43 F.3d at 1322 (holding likewise in a perfectly analogous situation).

---

[11]  Nor is there anything in the defendant's deposition testimony submitted to the court to support a finding he applied excessive torque.  The defendant merely testified that he "turned the cables."  There is nothing in his statement to support a finding that he applied excessive torque.

[12]  This is the Ninth Circuit decision following remand from the Supreme Court in the noteworthy case of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 113 S. Ct. 2786, 125 L. Ed.2d 469 (1993).

[13]  The plaintiffs had alleged that the use of the drug Bendectin by their mothers had caused their birth defects.

## VI.

Because the court has concluded that the plaintiffs have failed to introduce a genuine issue for trial as to their claims, the court need not decide whether the release executed by plaintiff Jerry Mitchell in the California litigation bars his claim against the defendant. It is conceded that the release would not bar plaintiff Cathy Mitchell's claims. Therefore, the release would not be dispositive even if it were found to bar the claims of Jerry Mitchell.

## CONCLUSION

The plaintiffs claim that the defendant applied excessive torque to the side terminal of the battery and that this caused the battery explosion that injured plaintiff Jerry Mitchell. The causes of battery explosions due to the application of excessive torque are beyond the scope of understanding of laymen. Therefore, without expert testimony to support their theory of causation, the plaintiffs cannot prevail. The plaintiffs have failed to submit the expert report required by this court's scheduling order, and their putative expert's testimony is due to be excluded for that reason. Even if it were not due to be barred because of plaintiffs' failure to comply with the scheduling order, the putative expert testimony is unreliable and inadmissible under Daubert and Kumho.

Even if the plaintiffs' proffered expert testimony were admitted and were sufficient to support a finding that the application of excessive torque to the battery terminal was the cause of the explosion, they have not introduced an issue of fact as to the

23

defendant having applied excessive torque to the battery. The only evidence supporting such finding is that the defendant used a pair of pliers, which the plaintiffs' putative expert testified could have allowed the application of excessive torque. There is simply no evidence that excessive torque was actually applied by the defendant.

Even if plaintiffs' putative expert testimony was otherwise admissible, it does not have selective application to plaintiffs' theory of causation. Mr. Mrotek's testimony is equally consistent with causes not attributable to the defendant's alleged application of excessive torque. Therefore, under Alabama law, it is insufficient to create an issue of fact as to defendant's negligence being the cause of the explosion because it does not have selective application to that theory of causation.

For these reasons, the plaintiffs have failed to introduce a genuine issue for trial and defendant is entitled to a judgment as a matter of law. An appropriate order will be entered contemporaneously herewith.

DONE this 12th day of July 2000.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.

24